UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

EDWARD DEAN OLSON,

                    Plaintiff,

      v.

JOHANNA SMITH; CORIZON
MEDICAL SERVICES, INC., f/k/a
CORRECTIONAL MEDICAL
SERVICES, INC.; JAN EPP; KIM
MILLER; LINDA GEHRKE; LOIS
ADRIAN; MICHAEL TAKAGI; KIM
EDWARDS; PAUL SCHWELLAR;
FRANK WELCH; RON JEANBLANC;
RONA SIGERT; CLEARWATER
COUNTY, including CLEARWATER
COUNTY SHERIFF'S OFFICE AND
CLEARWATER COUNTY JAIL;
CHRIS GOETZ; JOSEPH RINTELIN,
III; KRISTOPHER HULSING; and
CURTIS BERRY,

                    Defendants.

Case No. 1:10-cv-00586-BLW

**MEMORANDUM DECISION AND
ORDER**

Plaintiff Edward Dean Olson, a prisoner in the custody of the Idaho Department of

Correction ("IDOC"), filed this civil rights action in November 2010. Pending before the

Court are three motions for summary judgment filed by (1) Clearwater County, the

Clearwater County Sheriff's Office, the Clearwater County Jail, Chris Goetz, Joseph

Rintelen, Kristopher Hulsing, and Curtis Berry (collectively, "the Clearwater County

**MEMORANDUM DECISION AND ORDER  1**

Defendants") (Dkt. 163); (2) Corizon, Inc. f/k/a Correctional Medical Services, Inc. ("Corizon"), Kim Miller, Linda Gehrke, and Michael Takagi (collectively, "the Corizon Defendants") (Dkt. 165); and (3) Johanna K. Smith, Frank Welch, Paul Schwellar, Ron JeanBlanc, and Rona Siegert (collectively, "the IDOC Defendants") (Dkt. 166.)

Having fully reviewed the record, the Court finds that the facts and legal arguments are adequately presented in the briefs and record. Accordingly, in the interest of avoiding further delay, and because the Court conclusively finds that the decisional process would not be significantly aided by oral argument, this matter shall be decided on the record before this Court without oral argument. D. Idaho L. R. 7.1. For the reasons that follow, the Court concludes that the Defendants are entitled to summary judgment on all of Plaintiff's claims.

## INTRODUCTION

For the sake of efficiency, the Court will repeat its previous descriptions of the procedural history of this case, which can be found in three separate Orders: (1) the Initial Review Order (Dkt. 12) ("IRO"); (2) the Order dated September 5, 2012 (Dkt. 131) ("September 5 Order"); and (3) the Order dated March 14, 2013 (Dkt. 190) ("March 14 Order"):

> Over three years ago, on October 31, 2009, Plaintiff, an Idaho Department of Correction (IDOC) inmate, suffered severe head and facial injuries in an assault by another inmate while both inmates were working as inmate trustees at the Clearwater County Jail. (Dkt. 12, pp.6-7.) After the assault, Plaintiff was evaluated at Clearwater Valley Hospital and then transferred by life-flight to Sacred Heart Medical Center. (Affidavit of

**MEMORANDUM DECISION AND ORDER  2**

Michael Takagi, P.A., ¶ 8, Dkt. 101.) Plaintiff's injuries included the following: "closed head injury with loss of consciousness; multiple right sided facial fractures, including the medial orbital wall, inferior orbital wall with herniation of the orbital fats and maxillary and ethmoid sinuses, as well as involving the right zygoma, nasal bone and nasal septum; and a four centimeter forehead laceration." (*Id.*, ¶ 9.) Plaintiff's radiology report showed "a large soft hematoma in the right temporal region, but otherwise no intracranial abnormality and no evidence of mass effect, acute hemorrhage or definite acute cortical infract." (*Id.*) Plaintiff also alleges that he developed anxiety, depression, and other mental and emotional conditions after the assault. (Dkt. 12, p.7.)

(March 14 Order at 1-2.)

On Initial Review (Dkt. 12), Chief Magistrate Judge Candy Dale permitted Plaintiff to proceed only on certain claims: (1) Eighth Amendment failure to protect (and state-law negligence claims) against Defendants Sergeant Paul Schwellar and Lieutenant Frank Welsh; (2) Eighth Amendment failure to provide post-surgery follow-up treatment in the ISCI infirmary against Linda Gehrke; (3) Eighth Amendment failure to provide adequate food, water, and warm clothing during post-surgery transportation between the hospital and ISCI against Officer JeanBlanc; (4) Eighth Amendment failure to provide post-surgery medication and medical care against Nurse Kim Edwards, Linda Gehrke, Dr. Lois Adrian, Michael Takagi, Kim Miller, Linda Gehrke, and Jan Epp; (5) medical malpractice claims against Dr. Adrian (if Plaintiff had complied with Idaho's prelitigation screening requirements, set forth in Idaho Code § 6-1001); (6) state-law negligence claims against all of the individual defendants, and corresponding respondeat superior claims derivative of the state-law negligence claims, against CMS, Clearwater County, the Clearwater County Sheriff's Office, the Clearwater County Jail, and Clearwater County Sheriff Chris Goetz in his official capacity; and (7) claims for prospective injunctive relief regarding future protection and medical care against Warden Smith and IDOC Director of Medical Care Rona Seigert.

(September 5 Order at 2.)

Plaintiff filed a proposed Amended Complaint, which was over 328 pages in

length, on December 21, 2011. The Court

**MEMORANDUM DECISION AND ORDER  3**

> determined that the proposed amended complaint was vague, conclusory, confusing, and barely legible. (Order of September 5, 2012, Dkt. 131.) For purposes of judicial efficiency, the Court ordered Plaintiff to file a supplemental complaint to assert any new claims against the existing Defendants within 30 days (October 5, 2012), and to file five separate amended complaints against proposed new defendants that would be severed into separate cases within 60 days (November 5, 2012). (Dkt. 131.)

(March 14 Order at 3.)

Instead of filing a supplemental complaint and five separate second amended complaints, Plaintiff responded with a slew of motions, including for a Motion for Temporary Restraining Order or Preliminary Injunction. (Dkt. 94.) After reviewing all of the parties' submissions, the Court denied Plaintiffs' motion. (March 14 Order at 40.) The Court also dismissed without prejudice all of Plaintiff's claims against Defendants Jan Epp, Dr. Lois Adrian, Nurse Kim Edwards, and Shirley Roane. (*Id.* at 4.)

The three sets of Defendants each filed motions for summary judgment. Plaintiff did not respond to the Corizon Defendants' or the IDOC Defendants' motion. Although Plaintiff did file a response to the Clearwater County Defendants' Motion for Summary Judgment, that response was filed late. However, because of some uncertainty regarding whether Plaintiff had been provided an opportunity to view Exhibit C to the Affidavit of Chris Goetz, a DVD containing surveillance footage from the numerous cameras placed throughout the Clearwater County Jail, the Court deemed the response timely and ordered the IDOC Defendants, in whose custody the evidence was maintained, to notify the Court whether Plaintiff had a chance to view the evidence. (Order dated July 9, 2013, Dkt. 219,

**MEMORANDUM DECISION AND ORDER  4**

at 5.) The IDOC Defendants have done so, explaining that Plaintiff has had more than a

year to request the opportunity to view the DVD but did not do so:

> The record indicates that the Clearwater County Defendants produced to Plaintiff during the course of this litigation DVDs and flash drives that purport to contain video from the Clearwater County Jail. IDOC records indicate that on or about March 22, 2012, Plaintiff provided the ISCI Resource Center with a CD/DVD and two flash drives. Plaintiff represented to the Resource Officer that the materials contained video from the Clearwater County Jail. IDOC records further reflect that on or about December 7, 2012, Plaintiff provided the Resource Officer at ISCI a CD/DVD. No IDOC employee or representative has viewed the CD/DVDs or flash drives. On March 12, 2013, Plaintiff was transferred to IMSI. The CD/DVDs and flash drives were mailed from ISCI to IMSI; however, apparently there was an issue with the mailing and they remained in the mail room until May 23, 2013, at which time they were sent to the SICI Resource Center, as Plaintiff had been transferred to SICI on or about May 2, 2013. The CD/DVDs and flash drives are located in the SICI Resource Center where Plaintiff is currently housed. Equipment is and has been available to allow Plaintiff to view the CD/DVDs and flash drives. If Plaintiff had asked, he would have been given the opportunity to view the materials. However, at no time has Plaintiff requested to view the CD/DVDs or flash drives.

(Notice of Compliance, Dkt. 220, at 3.) The Court is now satisfied that Plaintiff simply

chose not to view the camera footage. Therefore, the Clearwater Defendants' Motion for

Summary Judgment is ripe for adjudication, along with the motions filed by the Corizon

Defendants and the IDOC Defendants.

Although Plaintiff did not respond to two of the three motions for summary

judgment, the Court has considered all of Plaintiff's submissions to date in its

consideration of Defendants' motions for summary judgment and has undertaken its own

independent analysis of the arguments and the evidence.

**MEMORANDUM DECISION AND ORDER  5**

## DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

### 1.    Summary Judgment Standard

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is not "a disfavored procedural shortcut," but is instead the "principal tool[] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id*. at 327. "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . ." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986). Rather, there must be no *genuine* dispute as to any *material* fact in order for a case to survive summary judgment.

A dispute is not genuine if no "reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. Material facts are those that may affect the outcome of the case. *Id*.

The evidence must be viewed in the light most favorable to the non-moving party, and the Court must not make credibility findings. *Id.* at 255. Although direct testimony of the non-movant must be believed, the Court is not required to adopt unreasonable

**MEMORANDUM DECISION AND ORDER  6**

inferences from circumstantial evidence. *McLaughlin v. Liu*, 849 F.2d 1205, 1208-09 (9th Cir. 1988).

The Court must be "guided by the substantive evidentiary standards that apply to the case." *Liberty Lobby*, 477 U.S. at 255. For example, if a claim requires clear and convincing evidence, the issue on summary judgment is whether a reasonable jury could conclude that clear and convincing evidence supports the claim. *Id*.

The moving party bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (en banc). To carry this burden, the moving party need not introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply point out the absence of evidence to support the nonmoving party's case. Fed. R. Civ. P. 56(c)(1)(A) & (B); *Fairbank v. Wunderman Cato Johnson,* 212 F.3d 528, 531 (9th Cir. 2000). The Court must consider "the cited materials," but it may also consider "other materials in the record." Fed. R. Civ. P. 56(c)(3).

If the moving party meets its initial responsibility, then the burden shifts to the non-moving party to produce evidence sufficient to support a jury verdict in his favor. *Devereaux*, 263 F.3d at 1076. The existence of a scintilla of evidence in support of the non-moving party's position is insufficient. Rather, "there must be evidence on which the jury could reasonably find for the [non-moving party]." *Liberty Lobby*, 477 U.S. at 252. The non-moving party must go beyond the pleadings and show by "affidavits, or by the

**MEMORANDUM DECISION AND ORDER  7**

depositions, answers to interrogatories, or admissions on file" that a genuine dispute of material fact exists. *Celotex Corp.*, 477 U.S. at 324 (internal quotation marks omitted). However, a verified complaint based on personal knowledge of admissible evidence constitutes an opposing affidavit to a summary judgment motion. *Schroeder v. McDonald*, 55 F.3d 454, 460 (9th Cir. 1995); *Davis v. Zahradnick*, 600 F.2d 458, 460 (4th Cir. 1979) (per curiam) (where the factual allegations of a verified complaint establish a prima facie case for relief under § 1983, and where the affidavits in support of summary judgment present conflicting versions of the facts which require credibility determinations, a genuine issue as to the material facts of the incident is presented, precluding summary judgment). "To function as an opposing affidavit, however, the verified complaint must be based on personal knowledge and set forth specific facts admissible in evidence." *Schroeder*, 55 F.3d at 460.

Material used to support or dispute a fact must be "presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). If the contents of the evidence could be presented in an admissible form at trial, those contents may be considered on summary judgment even if the evidence itself is hearsay. *Fraser v. Goodale*, 342 F.3d 1032, 1036-37 (9th Cir. 2003) (affirming consideration of hearsay contents of plaintiff's diary on summary judgment because at trial, plaintiff's testimony of contents would not be hearsay). Affidavits or declarations submitted in support of or in opposition to a summary judgment motion "must be made on personal knowledge, set out facts that

**MEMORANDUM DECISION AND ORDER  8**

would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

If a party "fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," the Court may consider that fact to be undisputed. Fed. R. Civ. P. 56(e). The Court will grant summary judgment in favor of the moving party "if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(3).

## 2.    Factual Background

This section includes facts that are undisputed and material to the resolution of the issues in this case. Where material facts are in dispute, the Court has included Plaintiff's version of facts, insofar as that version is not contradicted by clear documentary or videographic evidence in the record. *See Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.")

This unfortunate story began in January 2009, when an inmate riot broke out at the Idaho State Correctional Institution (ISCI), where Plaintiff was confined. During the riot, Plaintiff "stood up to the rioting inmates and saved the life of another inmate." (IRO at 4.) Plaintiff's actions, as well as his interviews with IDOC personnel in the aftermath of the riot, convinced some of the inmates that Plaintiff was a "snitch." (*Id.* at 5.) As a result,

**MEMORANDUM DECISION AND ORDER  9**

Plaintiff was transferred to the Idaho Correctional Institution at Orofino (ICIO) on January 28, 2009, to be placed in protective custody. (*Id.*; Compl., Dkt. 3-2, at 53.) But Plaintiff's reputation followed him to ICIO, and he became afraid for his safety there as well.

### A.      The Events at Clearwater County Jail

Several months after his arrival at ICIO, Plaintiff was transferred to the Clearwater County Jail to work as a "trustee," an inmate worker position. (IRO at 6.) On October 30, 2009, another inmate trustee arrived at the jail: Tom Ezell. (Compl. at 60.)

IDOC Defendant Paul Schweller was the ICIO Labor Coordinator at the time, and although Schweller does not specifically recall choosing Ezell for the trustee position, he would have been the person who selected Ezell. Defendant Schweller states that "it was [his] custom and habit to review all relevant inmate records for an applicant to determine whether he would be a suitable fit for the position." (Affidavit of Paul Schweller ("Schweller Aff."), Dkt. 166-5, ¶ 6.) At the time Ezell applied for the trustee position at the Clearwater County Jail, he met all the requirements for the position: Ezell was in minimum custody and had not been issued a Disciplinary Offense Report ("DOR") for over a year. (*Id.*) Plaintiff and Ezell had previously lived together at ICIO "in an open dorm setting" for about four months "with no reported problems or concerns." (*Id.* ¶ 7.) Prior to selecting Ezell for the position, Schweller had no knowledge of any problems between him and Plaintiff. (*Id.*)

**MEMORANDUM DECISION AND ORDER  10**

Plaintiff alleged in his Complaint that Defendant Frank Welch also participated in the decision to send Ezell to the Clearwater County Jail as an inmate trustee. Defendant Welch, however, states that he was on vacation from October 25 to October 31, 2009, "the time when Mr. Ezell would likely have been chosen for the trustee position." (Affidavit of Frank Welch ("Welch Aff."), Dkt. 166-6, ¶ 5.) Like Defendant Schweller, Defendant Welch does not recall choosing Ezell and claims that he had no knowledge of any issues between the two men. (*Id.* ¶ 4.) Plaintiff has not disputed either Schweller's or Welch's statements.

### 1.    October 30

After arriving at the Clearwater County Jail on October 30, 2009, Ezell informed Defendant Deputy Berry that he had worked with Plaintiff before. (Affidavit of Curtis Berry ("Berry Aff."), Dkt. 163-4, ¶ 3.) Berry avers that he told Plaintiff what Ezell had said, that Plaintiff said he did not recall working with Ezell, and that Berry told Plaintiff to notify him if "there were any problems" with Ezell. (*Id.*) Plaintiff alleges that he also told Berry that "something was very wrong" because he did not work with Ezell previously, nor were they friends. (Compl. at 60.) Plaintiff, however, does not dispute the Clearwater County Defendants' statements that Berry told Plaintiff to let him know if he and Ezell had problems, and that "Plaintiff did know Ezell . . . because they had live [sic] in the same dorm" at ICIO with no previous problems. (Clearwater County Stmt. of Undisp. Mat. Facts ("CC Stmt. of Facts"), Dkt. 163-2, ¶ 11; Plaintiff's Memo. in

MEMORANDUM DECISION AND ORDER  11

Opposition to Clearwater County Mot. for Summ. Judg., Dkt. 207, at 11 ("Memo. in Opp.").) After Plaintiff and Ezell began working together, Berry specifically asked Plaintiff if there were any issues between them. (Berry Aff. ¶ 3.) Plaintiff acknowledges that he told Berry he and Ezell "were getting along fine." (*Id.*; Memo. in Opp. at 11.)

Later that same day, Defendant Deputy Joe Rintelen came on duty and observed Plaintiff and Ezell working and interacting together. He saw no indication of any trouble brewing between the two men, and Plaintiff "did not tell Deputy Rintelen of any concerns he had with Ezell." (CC Stmt. of Facts ¶ 13; *see* Affidavit of Joe Rintelen ("Rintelen Aff."), Dkt. 163-5, ¶ 3.) These facts are not disputed. (Memo. in Opp. at 11.)

### 2.      October 31

Plaintiff alleges that during the time he was working with Ezell, Ezell brought up the riot several times. (Compl. at 61.) On October 31, 2009, after working in the Clearwater County Jail for less than a day, Ezell—perhaps motivated by Plaintiff's perceived role in the aftermath of the January riot—attacked and severely beat Plaintiff, inflicting injuries that Plaintiff must deal with for the rest of his life. The Clearwater County Defendants have submitted a DVD containing video footage of the jail on October 30 and 31, 2009, as recorded on the jail's numerous surveillance cameras. (Affidavit of Chris Goetz ("Goetz Aff."), Dkt. 163-3, Ex. C-1 and C-2.) Although the attack itself is not visible, the footage clearly depicts the events leading up to it. The Court notes that some of the time stamps on the camera footage do not match up to the

**MEMORANDUM DECISION AND ORDER  12**

precise times identified in the Clearwater County Defendants' Statement of Undisputed

Facts (Dkt. 163-2), but in all relevant respects the Statement of Undisputed Facts contains

an accurate description of the camera footage.

On the morning of October 31, Plaintiff asked Deputy Berry if he could go to

recreation. (CC Stmt. of Facts, ¶ 15.) Plaintiff alleges that Berry accompanied him into

the recreation area; that Plaintiff informed Berry that Ezell was mentioning the prison riot

in January; and that Plaintiff was afraid of Ezell: "[Berry] does unlock [the] door[,]

step[s] out[,] then he tells plaintiff to speak to Lt. Kris Hulsing when he gets back which

did distress plaintiff, immensely, as plaintiff told [Berry] how [Ezell] kept bringing up

[the] Riot." (Memo. in Opp. at 11.) The security cameras, however, show that Berry

opened the door to the recreation area; that Plaintiff stepped out; and that Berry did *not*

accompany Plaintiff but rather stayed behind in the hallway. (Ex. C-1, cameras 10 & 11;

*see also* CC Stmt. of Facts ¶ 15.)

When Berry let Plaintiff back in from recreation, cameras 10 and 11—showing the

hallway from which inmates enter the recreation area—reveal that at no time did Plaintiff

appear to be having any type of conversation with Berry, and "only seconds elapsed from

when Deputy Berry opened the door to let plaintiff back in from recreation and the door

closed." (Ex. C-1; CC Stmt. of Facts ¶ 17.) Plaintiff states that he cannot argue with the

video but that he did speak to Berry "about what I am saying." (Memo. in Opp. at 12; *see

also* Compl. at 63 ("Olson talked to Deputy Berry briefly and told him that Ezell was a

**MEMORANDUM DECISION AND ORDER  13**

handful, Olson was uneasy . . . .").)

Around 1:00 p.m., Ezell went to recreation. Even though Ezell was no longer near Plaintiff, and even though Plaintiff claims he was terrified of Ezell, Plaintiff did not speak to Berry about any such concerns while Ezell was in the recreation area. (CC Stmt. of Facts ¶ 19; Memo. in Opp. at 12.)

At 1:11 p.m., Plaintiff lay down in the inmate worker dorm room to take a nap. (CC Stmt. of Facts ¶ 22; Memo. in Opp. at 12.) The video footage shows that Plaintiff was still lying in his bed when Defendant Deputy Rintelen came into view of the camera as he walked down the hallway at 1:54 p.m. (Goetz Aff., Ex. C-1, cameras 10, 11, 12.)

Rintelen asked Ezell to help get a bed ready for a new inmate and went into the kitchen to make his lunch. (CC Stmt. of Facts ¶¶ 25-26.) Plaintiff woke up, left the dorm room, and met Ezell in the hallway. Ezell and Plaintiff had a discussion in front of the cell that needed to be prepared, and Plaintiff alleges Ezell threatened him. The surveillance video shows that no one else was in the hallway during this conversation between Plaintiff and Ezell. (*Id.* ¶ 28; Goetz Aff., Ex. C-1, cameras 10 & 11.) Plaintiff remembers this event differently; he claims that Rintelen was also in the hallway and that Plaintiff told Rintelen that Ezell "wanted to fight" Plaintiff and at least one other inmate. (Memo. in Opp. at 12.) The camera in the kitchen verifies, however, that Deputy Rintelen remained in the kitchen for the entire duration of Plaintiff's and Ezell's conversation, which lasted less than one minute. (Goetz Aff., Ex. C-2, camera 11.)

**MEMORANDUM DECISION AND ORDER  14**

After speaking to Ezell in the hallway, Plaintiff went back to the dorm room. (CC Stmt. of Facts ¶ 29; Ex. C-1, cameras 10, 11, 12.) Between 1:56 and 1:57 p.m., Ezell walked into the room. Both he and Plaintiff ended up standing in the only area in the dorm room that the surveillance cameras do not cover—the area facing the bathroom. (CC Stmt. of Facts ¶ 35.)

At 1:57 p.m., Plaintiff walked out to the middle of the dorm room and apparently said something to Ezell (he can be seen on the DVD speaking back toward the bathroom). He then walked back out of view of the cameras. (*Id.* ¶ 36; Ex. C-1, camera 12.) 36 seconds later, Ezell left the dorm room and "walked directly to Deputy Rintelen who was still in the kitchen." (CC. Stmt. of Facts ¶ 37.) Rintelen states that Ezell told him that "he had just gotten into it" with Plaintiff. (Rintelen Aff. ¶ 4.) Rintelen locked Ezell in the library and went to help Plaintiff. (*Id.*) Ezell had severely beaten him and inflicted substantial injuries.

### B.    The Immediate Aftermath of the Attack

After the attack, Plaintiff was taken to Clearwater County Hospital and then to Sacred Heart Medical Center in Spokane, Washington, where he underwent surgery performed by Dr. Bryan McLelland. (Aff. of Michael Takagi ("First Takagi Aff."), Dkt. 101, ¶¶ 8-10.) Dr. McLelland "performed an open reduction and internal fixation from multiple approaches of the right zygoma fracture; open reduction of a right nasal bone fracture; closed reduction of the left nasal bone fracture; closed reduction of the nasal

**MEMORANDUM DECISION AND ORDER  15**

septal fracture; open reduction of the right orbital floor fracture; and closure of a right lower lid laceration one centimeter in length." (*Id.* ¶ 10.)

The next day, Corizon employee Linda Gehrke arranged with a Sacred Heart social worker for Plaintiff to be discharged. Defendant Gehrke told the social worker that the "best options" for Plaintiff would be St. Alphonsus Medical Center or the "twenty-four hour skilled nursing care and mid-level provider and physician care" at ISCI. (Affidavit of Linda Gehrke, Dkt. 165-4, ¶ 6 ("Gehrke Aff.").) The social worker informed Gehrke that Plaintiff would only be discharged to ISCI if Plaintiff's treating physician agreed. "The treating physician agreed that release to the ISCI infirmary would be medically appropriate." (*Id.*) Gehrke arranged for an ambulance to transport Plaintiff from Spokane to Boise. The ambulance was to be staffed with two EMTs. (*Id.* at ¶ 7.) Once Plaintiff was transported to ISCI, Gehrke "had no further involvement" with him other than reviewing Plaintiff's grievances. (*Id.* at ¶¶ 8-9.) Defendant Gehrke "had no authority to coordinate post-surgery care once [Plaintiff] was housed in the ISCI infirmary." (*Id.* at ¶ 8.)

On November 4, 2009, IDOC employee Defendant Ronald JeanBlanc accompanied Plaintiff in the ambulance on the 12-hour drive to ISCI. (Affidavit of Ronald JeanBlanc ("JeanBlanc Aff."), Dkt. 166-7, ¶ 6; Compl. at 72.) According to Plaintiff's Complaint, he was given a hospital gown to wear and a sheet to cover him, but no underwear or shoes for the trip in the "windy, breezy ambulance." (Compl. at 72-73.)

**MEMORANDUM DECISION AND ORDER  16**

He also claims he was not given any food except for a slice of pizza. (*Id.* at 72.)
Defendant JeanBlanc disputes these statements, stating that Plaintiff "was clothed in two
hospital gowns, one facing forward and one facing backward so that there was no gap in
the back. He was also provided blankets in the ambulance." (JeanBlanc Aff. at ¶¶ 8.)
JeanBlanc also avers that Plaintiff ate both breakfast and lunch before leaving Sacred
Heart, that he received snacks and water during two stops between Spokane and Kuna,
and that either JeanBlanc or another officer loaned Plaintiff a coat during those stops. (*Id.*
¶ 9.)

### C.    Plaintiff's Long-Term Medical Treatment

Once Plaintiff was transferred to ISCI, "ISCI infirmary staff monitored and treated
Olson's condition on a daily basis (and often multiple times within such days) from
November 4, 2009 through December 14, 2009." (First Takagi Aff. ¶ 12.) Throughout
that time, Plaintiff "was evaluated by on-site nurses, physician's assistants, physicians and
an off-site specialist physician. He was provided various forms of medication during this
time, including but not limited to pain medications (Hydrocodone, Lortab, Tylenol
Ibuprofen), antibiotics (Augmentin and Bacitracin), saline nasal spray, and ice to decrease
swelling." (*Id.* ¶ 12 (internal citations omitted).)

Defendant Michael Takagi, a physician's assistant, treated Plaintiff from
November 23 to December 13, 2009. (Affidavit of Michael Takagi ("Second Takagi
Aff."), Dkt. 165-3, at ¶ 3 (internal citations omitted).) On his first appointment with P.A.

**MEMORANDUM DECISION AND ORDER  17**

Takagi, Plaintiff refused to be examined, but he did describe his medical issues. The two

"had a long discussion about pain medications," after which P.A. Takagi prescribed

acetaminophen and ibuprofen. (*Id.* ¶ 4.) P.A. Takagi ordered an x-ray because Plaintiff

complained of pain in his sinuses and noted that Plaintiff was going to see a maxillofacial

surgeon "for follow-up." (*Id.*)

On November 27, Plaintiff saw P.A. Takagi twice. During the first visit, P.A.

Takagi "noted that Olson was doing fine, but with some green drainage from the right

nostril." (*Id.* ¶ 5.) Takagi ordered a saline nasal spray for Plaintiff after noticing "that

there was still some mucous obstruction." (*Id.*) Later that evening, Plaintiff told Takagi

"he was doing well with no pain or headaches." (*Id.*)

Dr. Bret Rodgers, an outside specialist in facial plastic surgery, examined Plaintiff

on December 9, 2013. (First Takagi Aff. ¶ 17.) Dr. Rodgers recommended that Plaintiff

continue his antibiotics and that he should have a follow-up appointment in three months'

time with an ear, nose, and throat doctor (ENT). (*Id.*) P.A. Takagi reviewed Dr. Rodgers's

recommendation and noted that an order for the follow-up evaluation had already been

made. (Second Takagi Aff. ¶ 6.) Plaintiff told Takagi that he was "doing well and in no

pain." (*Id.*) After examining Plaintiff twice more, P.A. Takagi determined on December

13 that Plaintiff's condition was stable, though Plaintiff "still had a little numbness on the

right side of the face and was taking antibiotics for nasal drainage and sinusitis." (First

Takagi Aff. ¶ 18.)

**MEMORANDUM DECISION AND ORDER  18**

Plaintiff was transferred to ICIO approximately two weeks later, and he remained there until August 31, 2010. (*Id.* ¶ 19.) During his approximately eight-month stay at ICIO, Plaintiff

> was evaluated and/or treated by Rory York, N.P. approximately thirteen times; Phillip Petersen, M.D., approximately seven times; Wendy Gebhart, M.Ed., one time; Clayton Bunt, M.D., one time; Jeff Burry, D.O., two times; and correctional medical specialists, approximately seven times. Medical staff provided Olson with medications for pain (Ibuprofen, Tylenol, Vicodin, Hydrocodone, Tramadol, Naproxen), nausea (Antivert), sinusitis (Augmentin, Benadryl), gastritis (Zantac, Prilosec), constipation (Colace, Dulcolax). Medical staff provided saline nose spray to address Olson's nasal issues. Medical staff ordered two x-rays be taken; one in relation to worsening neck pain and the other in relation to the status of Olson's facial bones.

(*Id.* (internal citations omitted).)

More specifically, on January 8, 2010, Plaintiff was examined by Dr. Peterson, who noted that Plaintiff was still healing from the assault and his subsequent reconstructive surgery at Sacred Heart. (*Id.* ¶ 20.) The doctor ordered an x-ray of Plaintiff's facial bones, which was taken on January 20, and "determined that Olson should continue with conservative care and treatment and to follow-up with him in two months times [sic]." (*Id.*) A bit more than two months later, on March 24, Dr. Petersen recommended a consultation with an outside ENT specialist. Dr. Burry examined Plaintiff on May 27, 2010 and concluded that Plaintiff "had nasal airway obstruction with a strongly deviated nasal septum on the right side causing total blockage in the region." (*Id.*) Dr. Burry suggested a septoplasty to straighten Plaintiff's deviated septum and nasal reconstruction, and Dr. Petersen agreed.

**MEMORANDUM DECISION AND ORDER  19**

Plaintiff underwent the septoplasty surgery approximately six weeks later and was

taken back to ICIO. (*Id.* ¶ 21.) Plaintiff was provided ice and extra pillows and blankets

for his recovery, and Dr. Petersen declared the septoplasty a success on July 22, 2010. (*Id.*

¶ 21.) Although Dr. Petersen believed that Plaintiff might need further evaluation from a

maxillofacial surgeon and orbital specialist, he decided to wait for Dr. Burry's

assessment. Dr. Burry did not believe further surgery was necessary, but believed Plaintiff

should still be evaluated for surgery. Plaintiff was then transferred to back to ISCI on

September 1, 2010, "because such specialist physicians" were not available near ICIO.

(*Id.*)

Plaintiff filed his Complaint in November 2010. In its Order denying Plaintiff's

motion for a preliminary injunction, the Court described Plaintiff's medical treatment

over the next several years as follows:

### (1) Eye and Nose Issues

Plaintiff saw Dr. Rodgers again, who recommended a CT scan of the facial bones and a consultation with an ophthalmologist. Dr. Boerner, the ophthalmologist, recommended surgery to elevate the orbit and remove fat from the area, and that surgery was performed on January 6, 2011. Plaintiff saw Dr. Boerner again for follow-up, who noted that Plaintiff was recovering well.

Plaintiff then saw Dr. McNeel and Dr. Lee to determine how to best aid his vision problems. On August 11, 2011, Dr. Lee recommended prism glasses, and Dr. McNeel prescribed them on August 16, 2011. However, Plaintiff was not satisfied with the recommendation for glasses; he also decided he no longer wanted to see Dr. Boerner. On September 23, 2011, Plaintiff complained of eye problems, including inability to focus, double or triple stacked vision, and excruciating pain. Gen Brewer, LPN, observed Plaintiff at pill call, and noted that he had no complaints of pain, had a steady gait, and stood in line without

**MEMORANDUM DECISION AND ORDER  20**

assistance.

On September 27, 2011, Dr. Boerner sent Plaintiff a letter stating that nothing further could be done to improve the range of his eyes, and that Plaintiff had only a "very slight misalignment when he looked straight ahead."

. . . .

### (2) Balance Issues

. . . .

Nurse Practitioner York performed a Romberg test on Plaintiff, which is a neurological examination to test a person's balance skills. The test was negative. York retested Plaintiff on March 18, 2010. The test was again negative, but York prescribed Antivert, because he thought Plaintiff might have some positional vertigo. Dr. Burry evaluated Plaintiff on or about May 27, 2010, noting that the vertigo resulted from the assault and may be a permanent injury, but that Plaintiff would be able to see improvement two years from the assault.

On October 14, 2010, Plaintiff complained to prison physician Dr. Lossmann that he had vertigo from time to time, and that sleeping elevated seemed to help. Dr. Lossman prescribed two pillows to Plaintiff for head elevation.

Plaintiff did not complain of vertigo again until February 23, 2011. As a result, Plaintiff was sent to a balance clinic, where Plaintiff was tested and where it was determined that there was no evidence of vertigo. Plaintiff was released from the clinic on April 29, 2011, with instructions for home exercises.

On May 26, 2011, Dr. Lossmann noted that Plaintiff was showing good results regarding the balance clinic. At that time, Plaintiff expressed that he thought a neck injury might be causing the vertigo. As a result, Dr. Lossmann scheduled Plaintiff to see a neurologist, Dr. Little, but Plaintiff himself cancelled the appointment on June 21, 2011.

. . . .

### (3) Dental/Jaw/Mouth Issues

Dr. Cushing, a prison dentist, evaluated Plaintiff's dental, jaw, and mouth issues on July 3, 2012. It was noted that Plaintiff's fistula was barely visible, and Plaintiff complained of pain while chewing and nose pain. Dr. Cushing referred Plaintiff to Dr. Comstock, an oral and maxillofacial surgeon, to rule out infection

**MEMORANDUM DECISION AND ORDER  21**

and possible root canal.

      Dr. Comstock evaluated Plaintiff on July 23, 2012, and determined that Plaintiff should have the plate and screws in his jaw removed and that Plaintiff's mouth splint should be repaired. Dr. Comstock recommended that Plaintiff continue working with Dr. Kuehne, D.M.D., a third professional. Plaintiff received a new mandibular splint from Dr. Kuehne on September 25, 2012.

      Dr. Cushing evaluated Plaintiff for complaints of "weird pain" on August 1, 2012, and noted that he would follow up with Plaintiff after Dr. Comstock performed the surgery.

      Dr. Comstock performed the surgery on August 9, 2012 and removed three screws above the roots of the teeth, which may have been causing irritation; he did not find it necessary to remove the plate because it was solidly in position and the bone well-healed without signs of infection. Dr. Comstock noted that Plaintiff needed a root canal, which likely was causing him pain. Dr. Cushing followed up with Plaintiff on August 28, 2012, to discuss Dr. Comstock's recommendations with Plaintiff, and Dr. Cushing performed the root canal on September 17, 2012.

(March 14 Order at 24-29 (internal quotation marks, citations, and alterations omitted).)

      As a result of the attack, Plaintiff suffers from chronic pain. In addition to the pain medications identified above—Ibuprofen, Tylenol, Vicodin, Hydrocodone, Tramadol, and Naproxen—medical staff also prescribed Plaintiff MS Contin, which is a twelve-hour controlled-release morphine medication. (*Id.* at 34.) "That medication was changed to Norco in July 2012." (*Id.*)

      Medical providers have also repeatedly tested Plaintiff for traumatic brain injury. Plaintiff was sent to radiology "immediately after the assault on October 31, 2009." (*Id.* at 35.) The radiology report "showed no intracranial abnormalities, no mass effect, acute hemorrhage, definite acute cortical infarct, or intracranial air. A radiology report taken

**MEMORANDUM DECISION AND ORDER  22**

one year later showed that the visualized portions of Plaintiff's brain appeared normal." (*Id.* (citation marks omitted).)

With respect to Plaintiff's mental health treatment, "[t]he medical records reflect that Plaintiff has had numerous mental health consultations to help him learn to cope with his recovery and permanent injuries," including sixteen mental health evaluations over a three-month period. (*Id.* at 31.) "Plaintiff was reported as 'stable' in his mental health evaluations in the Fall of 2012." (*Id.* at 32.)

Plaintiff has not disputed any of these facts regarding his medical treatment.

## 3.    Standards of Law

### A.    Section 1983 Claims

Plaintiff brings claims under 42 U.S.C. § 1983, the civil rights statute. To state a valid claim under § 1983, a plaintiff must allege a violation of rights protected by the Constitution or created by federal statute proximately caused by the conduct of a person acting under color of state law. *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991).

A prison official is not liable for damages in his or her individual capacity under § 1983 unless he or she personally participated in the alleged constitutional violations. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 667 (2009) ("[E]ach Government official, his or her title notwithstanding, is only liable for his or her own misconduct."). "A defendant may be held liable as a supervisor under § 1983 'if there exists either (1) his or her personal involvement in the

**MEMORANDUM DECISION AND ORDER  23**

constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.'" *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) (quoting *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989)). This causal connection "can be established by setting in motion a series of acts by others, or by knowingly refusing to terminate a series of acts by others, which the supervisor knew or reasonably should have known would cause others to inflict a constitutional injury." *Id.* at 1207-08 (internal quotation marks, citation, and alterations omitted).

To succeed on his claims against Clearwater County, the Clearwater County Sheriff's Office, the Clearwater County Jail, and Corizon as entities, Plaintiff must meet the test articulated in *Monell v. Department of Social Services*, 436 U.S. 658, 690-94 (1978); *see Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1139 (9th Cir. 2012) (applying *Monell* to private entities). Under *Monell*, the requisite elements of a § 1983 claim against a municipality or private entity performing a state function are the following: (1) the plaintiff was deprived of a constitutional right; (2) the municipality or entity had a policy or custom; (3) the policy or custom amounted to deliberate indifference to the plaintiff's constitutional right; and (4) the policy or custom was the moving force behind the constitutional violation. *Mabe v. San Bernardino Cnty.*, 237 F.3d 1101, 1110-11 (9th Cir. 2001). An unwritten policy or custom must be so "persistent and widespread" that it constitutes a "permanent and well settled" practice. *Monell*, 436 U.S. at 691 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167-168 (1970)). "Liability for improper

**MEMORANDUM DECISION AND ORDER  24**

custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996).

Plaintiff asserts claims under the Eighth Amendment to the United States Constitution. To state an Eighth Amendment claim, Plaintiff must first show that he is or was "incarcerated under conditions posing a substantial risk of serious harm." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). This is the objective prong of the analysis. Plaintiff must then show that Defendants were deliberately indifferent to that risk. To exhibit deliberate indifference, a prison official "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. Prison officials who act with deliberate indifference "to the threat of serious harm or injury" by one prisoner against another are subject to liability under § 1983. *Berg v. Kincheloe*, 794 F.2d 457, 459 (9th Cir. 1986). "Having incarcerated persons with demonstrated proclivities for antisocial criminal, and often violent, conduct, having stripped them of virtually every means of self-protection and foreclosed their access to outside aid, the government and its officials are not free to let the state of nature take its course." *Farmer*, 511 U.S. at 833 (internal quotation marks, citation, and alterations omitted).

The Eighth Amendment also requires that prisoners receive minimally adequate

**MEMORANDUM DECISION AND ORDER  25**

medical care, and prison officials or prison medical providers can be held liable if their "acts or omissions [were] sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). The Eighth Amendment right to adequate prison health care includes adequate mental health treatment, and the standards are the same whether the treatment is considered physical or mental. *Doty v. County of Lassen*, 37 F.3d 540, 546 (9th Cir. 1994).

"Because society does not expect that prisoners will have unqualified access to health care, deliberate indifference to medical needs amounts to an Eighth Amendment violation only if those needs are 'serious.'" *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). The Ninth Circuit has defined a "serious medical need" in the following ways:

> failure to treat a prisoner's condition [that] could result in further significant injury or the unnecessary and wanton infliction of pain[;] . . . [t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain . . . .

*McGuckin v. Smith,* 974 F.2d 1050, 1059-60 (9th Cir. 1992) (internal citations omitted), *overruled in part on other grounds*, *WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc).

In the medical context, deliberate indifference can be "manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Estelle*, 429 U.S. at 104-05 (footnotes omitted). A conclusion that a

**MEMORANDUM DECISION AND ORDER  26**

defendant acted with deliberate indifference requires that the plaintiff show both "a purposeful act or failure to respond to a prisoner's pain or possible medical need and . . . harm caused by the indifference." *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006). However, if an inmate faces a substantial risk of serious harm, he need not wait until he actually suffers that harm before asserting a deliberate indifference claim. *See Helling v. McKinney*, 509 U.S. 25, 33 (1993) ("That the Eighth Amendment protects against future harm to inmates is not a novel proposition.").

Differences in judgment between an inmate and prison medical personnel regarding appropriate medical diagnosis and treatment are not enough to establish a deliberate indifference claim. *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989)."[T]o prevail on a claim involving choices between alternative courses of treatment, a prisoner must show that the chosen course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk' to the prisoner's health." *Toguchi v. Chung*, 391 F.3d 1051, 1058 (9th Cir. 2004) (alteration omitted) (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)).

Mere indifference, medical malpractice, or negligence will not support a cause of action under the Eighth Amendment. *Broughton v. Cutter Labs.*, 622 F.2d 458, 460 (9th Cir. 1980) (per curiam). A mere delay in treatment does not constitute a violation of the Eighth Amendment unless the delay causes further harm. *McGuckin*, 974 F.2d at 1060. If medical personnel have been "consistently responsive to [the inmate's] medical needs,"

**MEMORANDUM DECISION AND ORDER  27**

and there has been no showing that medical personnel had "subjective knowledge and conscious disregard of a substantial risk of serious injury," summary judgment for medical personnel is appropriate. *Toguchi*, 391 F.3d at 1061.

The Eighth Amendment does not provide a right to a specific treatment. *See Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997) ("[The plaintiff] is not entitled to demand specific care. She is not entitled to the best care possible. She is entitled to reasonable measures to meet a substantial risk of serious harm to her."). And there is no constitutional right to an outside medical provider of one's own choice. *Roberts v. Spalding*, 783 F.2d 867, 870 (9th Cir. 1986) ("A prison inmate has no independent constitutional right to outside medical care additional and supplemental to the medical care provided by the prison staff within the institution.").

### B.    State Law Claims

Plaintiff also asserts claims of negligence and medical malpractice under Idaho law. "In a negligence action the plaintiff must establish the following elements: '(1) a duty, recognized by law, requiring the defendant to conform to a certain standard of conduct; (2) a breach of duty; (3) a causal connection between the defendant's conduct and the resulting injuries; and (4) actual loss or damage.'" *Jones v. Starnes*, 245 P.3d 1009, 1012 (Idaho 2011) (quoting *Hansen v. City of Pocatello*, 184 P.3d 206, 208 (Idaho 2008)).

The specific elements of a medical malpractice claim are stated in § 6-1012 of the

**MEMORANDUM DECISION AND ORDER  28**

Idaho Code:

> In any case, claim or action for damages due to injury to or death of any
> person, brought against any physician and surgeon or other provider of
> health care . . . such claimant or plaintiff must, as an essential part of his or
> her case in chief, affirmatively prove by direct expert testimony and by a
> preponderance of all the competent evidence, that such defendant then and
> there negligently failed to meet the applicable standard of health care
> practice of the community in which such care allegedly was or should have
> been provided . . . .

Idaho Code § 6-1012.

## 4. Discussion

### A. Clearwater County Defendants' Motion for Summary Judgment

Consideration of the legal standards and facts set forth above leads to the
inescapable conclusion that the Clearwater County Defendants are entitled to summary
judgment.

There is no evidence that Rintelen had any inkling that Ezell was a danger to
Plaintiff, or that Rintelen deliberately disregarded the risk posed by Ezell. Rintelen was in
the kitchen during the attack. He states that there is a large fan near the kitchen, which
makes it difficult to hear, and that he did not hear the attack. (Rintelen Aff. ¶ 4.) Although
Plaintiff's Complaint states that he informed Defendant Rintelen in the hallway that Ezell
was threatening him and that Rintelen "just shrugged his shoulders" (Compl. at 65), the
surveillance footage does not support these allegations. Rintelen was not in the
hallway—indeed, he never left the kitchen—when Ezell and Plaintiff were arguing, so he
could not have anticipated Ezell's brutal attack. (Goetz Aff., Ex. C-1, cameras 10 & 11;

**MEMORANDUM DECISION AND ORDER  29**

Ex. C-2, camera 11.) Because clear, videographic evidence blatantly contradicts Plaintiff's version of the facts, the Court declines to adopt that version on summary judgment. *See Scott*, 550 U.S. at 380. Plaintiff's dispute regarding Defendant Rintelen's actions is not genuine.

With respect to Defendant Berry, Plaintiff has failed to overcome the Clearwater County Defendants' evidence that Berry was not deliberately indifferent to a substantial risk of serious harm. Plaintiff alleges that he told Berry at recreation about his fear of Ezell, but that allegation is "blatantly contradicted" by the camera footage, which shows that Berry did *not* accompany Plaintiff to recreation and did not have any conversation with Plaintiff when Plaintiff came back. *See id.* Plaintiff did initially inform Berry that he had not worked with Ezell before as Ezell claimed, but that fact still does not show that Berry was subjectively aware of a substantial risk of serious harm. Berry could have thought that either Plaintiff or Ezell was simply mistaken about their history. Plaintiff knew Ezell from their time together at ICIO, and they had no previous problems with one another. Berry saw nothing the day before of or the day of the attack that should have put him on notice that Ezell was a danger to Plaintiff. Berry asked Plaintiff to let him know if Ezell gave him any problems and on one occasion explicitly asked Plaintiff how it was going with Ezell; Plaintiff responded that everything was fine. (Berry Aff. ¶ 3; Memo. in Opp. at 11.)

No admissible evidence supports Plaintiff's claims that Berry or Rintelen were

**MEMORANDUM DECISION AND ORDER  30**

deliberately indifferent to Plaintiff's safety. And because neither Defendant Sheriff Goetz nor Defendant Lieutenant Hulsing were on duty on October 30 or 31, 2009 (CC Stmt. of Facts ¶ 41), they did not personally participate in any actions with respect to the relationship of and conflict between Plaintiff and Ezell. Therefore, to succeed on his Eighth Amendment claims against these Defendants, Plaintiff must show that they are subject to supervisory liability. Plaintiff has failed, however, to raise any inference that Goetz or Hulsing "set[] in motion a series of acts by others, or . . . knowingly refus[ed] to terminate a series of acts by others, which [Goetz and Hulsing] knew or reasonably should have known would cause others to inflict a constitutional injury." *Starr*, 652 F.3d at 1207 (9th Cir. 2011) (internal quotation marks, citation, and alterations omitted).

Neither can Plaintiff's section 1983 policy claims against Clearwater County, the Clearwater County Sheriff's Office, and the Clearwater County Jail survive summary judgment. There is no evidence in this record to support an inference that the County entities had a policy constituting deliberate indifference to inmates' safety.

With respect to Plaintiff's negligence claims, the Clearwater County Defendants have met their initial burden of showing that they did not negligently breach their duty to keep Plaintiff safe. Plaintiff has failed to rebut this strong showing. As noted, there was no indication prior to the attack that Ezell might injure Plaintiff. Plaintiff and Ezell were alone in the hallway when they interacted with each other. Deputy Rintelen could not hear either this conversation or the attack itself, and Berry acted reasonably in checking on

**MEMORANDUM DECISION AND ORDER  31**

Plaintiff's relationship with Ezell. Plaintiff himself told Berry that he and Ezell "were getting along fine." (Berry Aff. ¶ 3.) The Clearwater County Defendants knew that the IDOC had chosen Ezell for the inmate worker position; thus, they knew that Ezell was a minimum custody inmate who had been DOR-free for at least a year. (*See* Schweller Aff. ¶ 6.) Ezell simply did not appear to be a dangerous inmate; that he was in fact dangerous does not mean the Defendants were negligent. The Clearwater County Defendants acted reasonably and cannot be held liable for the unpredictable act of violence committed by Ezell.

### B.    Corizon Defendants' Motion for Summary Judgment

Plaintiff did not respond to the Corizon Defendants' Motion for Summary Judgment. Therefore, the Court considers the Corizon Defendants' representation of the material facts as undisputed insofar as that representation does not clearly contradict specific factual allegations in Plaintiff's Complaint. After reviewing Plaintiff's medical records and considering these undisputed facts, the Court concludes that although Plaintiff's medical needs are obviously quite serious, he has failed to overcome the Corizon Defendants' evidence that (1) Corizon did not have a policy or practice amounting to deliberate indifference, and (2) Defendants Miller, Gehrke, and Takagi did not act with deliberate indifference to Plaintiff's serious medical needs.

Plaintiff's medical records reveal that he has been treated more than competently since the October 2009 attack. The sheer number of medical and mental health

**MEMORANDUM DECISION AND ORDER  32**

appointments, the willingness of the Corizon Defendants to seek outside consultations from specialists in various medical fields, and Plaintiff's multiple surgeries and prescriptions establish that Plaintiff's medical treatment satisfies the Eighth Amendment. Many free citizens outside of prison could not have had access to the amount and quality of care that Plaintiff has. Plaintiff has not cast any doubt on the Corizon Defendants' evidence that his extensive medical treatment was and has been perfectly constitutional.

Plaintiff claims that Defendant Gehrke inhibited his access to appropriate medical treatment by arranging Plaintiff's transport from Sacred Heart to ISCI and by responding to grievances. First, there is no evidence that she acted with a culpable state of mind when she set up the transport from Spokane to ISCI. The social worker informed Gehrke that Plaintiff would only be released to ISCI if his treating physician agreed. (Gehrke Aff. ¶ 6.) Because that doctor concluded that Plaintiff could safely be discharged from Sacred Heart into the care of the ISCI infirmary (*id.*), Gehrke cannot be faulted for arranging that transport.

Although Defendant Gehrke was involved in the grievance process and reviewed some of Plaintiff's grievances, Gehrke's role was administrative. She had "no authority to establish medical treatment protocol or procedure," was not "authorized to supervise the medical care with respect to those medical providers who provide[d] [Plaintiff] medical care." (*Id.* ¶ 4.) Defendant Miller, who was also involved in the grievance process, similarly had no such authority. It is well established that "[t]here is no legitimate claim

**MEMORANDUM DECISION AND ORDER  33**

of entitlement to a [prison] grievance procedure." *Mann v. Adams*, 855 F.2d 639, 640 (9th

Cir. 1988); *see Sandin v. Connor*, 515 U.S. 472, 484 (1995) (noting that liberty interests

protected under the Due Process Clause are "generally limited to freedom from

restraint"). As one court has explained, where the defendants' "only roles in [a civil

rights] action involve the denial of administrative grievances or the failure to act[] . . .

they cannot be liable under § 1983." *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999).

Finally, the individual defendants cannot be held liable for inhibiting Plaintiff's

access to proper medical care because his care was more than adequate for purposes of

the Eighth Amendment. For the above reasons, the Corizon Defendants are entitled to

summary judgment on Plaintiff's Eighth Amendment claims.

Plaintiff's medical malpractice claims also fail. Plaintiff has not submitted any

evidence establishing either (1) the standard of medical care applicable to Plaintiff's

claims or (2) any Defendant's breach of that standard of care. *See* Idaho Code § 6-1012.

Plaintiff has offered nothing that tends to show that any of Plaintiff's medical providers

have acted negligently in their provision of medical treatment.

### C.   IDOC Defendants' Motion for Summary Judgment

Just as he failed to respond to the Corizon Defendants' motion, Plaintiff also did

not respond to the IDOC Defendants' Motion for Summary Judgment. The Court thus

considers the IDOC Defendants' representation of the material facts as undisputed to the

extent that those facts do not clearly contradict specific factual allegations in Plaintiff's

Complaint.

Defendants Schweller and Welch both state that they knew of no problems between Plaintiff and Ezell prior to Ezell's selection as an inmate trustee at the Clearwater County Jail. (Schweller Aff. ¶ 7; Welch Aff. ¶ 4.) Defendant Welch was on vacation when Ezell was transferred to the jail, and Ezell met all of the qualification requirements for the trustee position. (Schweller Aff. ¶ 6; Welch Aff. ¶ 5.) Neither of these Defendants were deliberately indifferent to a risk that Ezell would harm Plaintiff if sent to work at the jail. Plaintiff's negligence claims against Defendants Schweller and Welch fail for the same reasons. Nothing in this record raises an inference that these Defendants acted unreasonably. And even if these Defendants had acted negligently—which they did not—the evidence does not suggest that they could have foreseen that Ezell might attack Plaintiff. *Fragnella v. Petrovich*, 281 P.3d 103, 110 (Idaho 2012) ("The legal responsibility element of proximate causation is satisfied if at the time of the defendant's negligent act the [plaintiff's] injury was reasonably foreseeable as a natural or probable consequence of the defendant's conduct." (internal quotation marks omitted)). Ezell was in minimum custody and had not been issued a DOR in more than a year.

Plaintiff's claims for prospective injunctive relief against Defendants Smith and Seigert regarding future protection and medical care must also be dismissed. These Defendants met their initial burden of establishing that neither Plaintiff's physical safety

**MEMORANDUM DECISION AND ORDER  35**

nor his health is currently at risk. Thus, the burden shifted to Plaintiff, who did not submit any evidence that he is likely to suffer future attacks from other inmates or to be subjected to inadequate medical treatment in the future. *See Bank of Lake Tahoe v. Bank of America*, 318 F.3d 914, 918 (9th Cir. 2003) ("An award of prospective injunctive relief requires the plaintiff to demonstrate a reasonable likelihood of future injury.")

With respect to Plaintiff's claims against Defendant JeanBlanc, the Court recognizes that there is a dispute of fact regarding the conditions Plaintiff experienced during the ambulance ride from Sacred Heart to ISCI. However, this dispute is not genuine. *See Liberty Lobby*, 477 U.S. at 248.

Plaintiff's recollection about the ambulance ride is suspect because, as he testified in his deposition, he "didn't even know hardly who [he] was" and hardly remembers the ride due to the level of morphine in his system. (Ex. C to Affidavit of Megan Goicoechea, Dkt. 166-8; Olson Depo. p.96.) The Court need not accept as true Plaintiff's memories when even he cannot be sure of them. After considering all of the evidence submitted by the parties, the Court concludes that no "reasonable jury could return a verdict" for Plaintiff on his claims against Defendant JeanBlanc. *Liberty Lobby*, 477 U.S. at 248.

Further, even if the Court were to ignore Plaintiff's deposition testimony and conclude that this dispute is, in fact, genuine, the actions of Defendant JeanBlanc as described in the Complaint do not rise to the level of a constitutional violation. Although prison officials have a duty to ensure that prisoners are provided adequate shelter, food,

**MEMORANDUM DECISION AND ORDER  36**

and clothing, "[t]he circumstances, nature, and duration of a deprivation of these necessities must be considered in determining whether a constitutional violation has occurred." *Johnson v. Lewis*, 217 F.3d 726, 731 (9th Cir. 2000). Temporary deprivations of such necessities—like the conditions in the ambulance—do not violate the Eighth Amendment.  *See, e.g., Anderson v. County of Kern*, 45 F.3d 1310 (9th Cir. 1995).

Similarly, even if Plaintiff's memories of the transport are accurate, he has failed to rebut the IDOC Defendants' evidence that JeanBlanc satisfied his duty of care. Plaintiff had at least one hospital gown and was covered with either a sheet or a blanket while in the ambulance. He did have food during transport, though he would have wished for more than a slice of pizza. Particularly considering that Plaintiff's recollection of the ambulance ride is not reliable, no reasonable juror could find that Defendant JeanBlanc negligently breached a duty of care during Plaintiff's 12-hour transport to ISCI.

## CONCLUSION

The record reveals that in their dealings with Plaintiff, the Clearwater County Defendants, the Corizon Defendants, and the IDOC Defendants acted reasonably and consistently with the United States Constitution. Therefore, the Court will grant summary judgment to all Defendants remaining in this case. The Court does not address Defendants' other arguments.

**MEMORANDUM DECISION AND ORDER  37**

## ORDER

**IT IS ORDERED:**

1.     The Clearwater County Defendants' Motion for Summary Judgment (Dkt. 163) is GRANTED.

2.     The Corizon Defendants' Motion for Summary Judgment (Dkt. 165) is GRANTED.

3.     The IDOC Defendants' Motion for Summary Judgment (Dkt. 166) is GRANTED.

4.     All of Plaintiff's claims against the Clearwater County Defendants, the Corizon Defendants, and the IDOC Defendants, are DISMISSED with prejudice.

DATED:  **July 18, 2013**

Honorable B. Lynn Winmill
Chief U. S. District Judge

**MEMORANDUM DECISION AND ORDER  38**